Filed 5/27/22  P. v. Johnson CA4/1
Opinion on rehearing

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHANNEL JOHNSON,<br><br>    Defendant and Appellant. | D078243<br><br><br>(Super. Ct. No. SCD282654) |

APPEAL from a judgment of the Superior Court of San Diego County, Sharon B. Majors-Lewis, Judge.  Affirmed and remanded with directions.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorneys General, Arlene A. Sevidal, Warren Williams, and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

Channel Johnson stabbed her friend after a verbal argument.  Johnson contended she was acting in self-defense, but a jury convicted her of

attempted murder (Pen. Code, §§ 187, subd. (a), 664; count 1), assault with a deadly weapon (*id.*, § 245, subd. (a)(1); count 2), and cruelty to a child by inflicting mental suffering (*id.*, § 273a, subd. (b); count 3). The jury further found that the attempted murder was willful, deliberate and premeditated (*id.*, § 189); that Johnson personally used a dangerous and deadly weapon, a knife (*id.*, §§ 1192.7, subd. (c)(23), 12022, subd. (b)(1)); and that she personally inflicted great bodily injury (*id.*, §§ 1192.7, subd. (c)(8), 12022.7, subd. (a)).

On appeal, Johnson contends the trial court erred when it allowed the prosecution to introduce evidence of a prior stabbing incident under Evidence Code section 1101, subdivision (b).[1] She also contends the trial court erred when it denied her motion for a new trial based on newly discovered evidence that the victim committed an unrelated assault shortly before Johnson's trial. (Pen. Code, § 1181, subd. (8).) Johnson argues that, even if these errors are not prejudicial by themselves, they cumulatively amount to reversible error. We reject these contentions.

After we initially filed this opinion on March 10, 2022, Johnson filed a petition for rehearing, raising a new issue: whether she is entitled to remand for resentencing under Assembly Bill No. 518, which amended Penal Code section 654. (Stats. 2021, ch. 441, § 1, eff. Jan. 1, 2022.) We granted the rehearing petition and allowed the parties to file briefs on this new issue.[2] After reviewing the supplemental briefs, we now conclude that remand for resentencing is warranted. Upon resentencing, the trial court shall also

---

[1]    Unspecified statutory citations are to the Evidence Code.

[2]    We also invited the parties to request oral argument; however, neither party made such a request.

2

consider whether to exercise its new discretion under Penal Code section 1385, as amended by Senate Bill No. 81.  (Stats. 2021, ch. 721, § 1, eff. Jan. 1, 2022.)  We affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution's Case*

    1. *Victim K.G.*

K.G. has four young children and described her living situation as "[h]omeless."  When she testified, she had a scab by her eye, which she said was caused when she tripped and slid while playing with her children.  She admitted she had previously attempted to cash checks that were not hers.

K.G. testified that she and Johnson were good friends.  They went to school together when they were younger, and they later lived together at K.G.'s brother's house.  They spent time together every day, and Johnson had a good relationship with K.G.'s children.

In the days leading to the stabbing, K.G. had been sleeping in a car with her children.  One night, she and her children stayed with Johnson in a hotel room.  Then K.G. went to stay with another friend and ignored calls and messages to her phone.  The day before the stabbing, Johnson texted K.G. saying she was a "bad friend" and a "selfish friend."

On June 14, 2018, K.G. and her children were spending time with friends near a loading dock.  K.G. sat at the top of some stairs with her daughter N.C. while the youngest child slept in a stroller and the other children played nearby.  Around 3:45 p.m., Johnson approached by foot, asking K.G. why she did not answer her phone, telling her she was "selfish," that her kids were "dirty," and that she was going to "fuck [K.G.'s] baby daddy."  K.G. told Johnson "[her] kids aren't dirty," and she and Johnson continued to exchange words.  At one point, K.G. saw Johnson pull a knife

3

from her purse; the knife was "closed" but Johnson "swung it open" and held it near her hip. K.G., who had been sitting at the top of the stairs near the loading dock, stood and went down the stairs, telling Johnson " 'don't play' " and " 'stop playing.' " Johnson and K.G. argued about money, and K.G. threw money on the ground, but then picked it up and walked back toward the stairs. Johnson came toward K.G. as K.G. backed up toward the stairs; K.G. grabbed a glass liquor bottle from the ground nearby and threw it at Johnson, thinking it would make Johnson drop the knife. Johnson then "charged [toward K.G.] and said she was going to kill [her]." K.G. ran into the street and Johnson chased her, swinging the knife so close that it cut the back of K.G.'s shirt. K.G. ran back to the stairs, but turned and tripped going up the stairs, and fell, landing on her back. Her daughter N.C. was standing nearby holding a bag of chips, and swung the bag at Johnson, who pushed her away. Johnson stood over K.G. and said, " 'Bitch, I'm going to kill you,' " and swung at K.G.'s chest with the knife, cutting her twice. Johnson dropped the knife; when Johnson moved "like she was going to go for the knife again," K.G. slid the knife away. Johnson then ran off.

K.G. testified she was not drinking at the loading dock but she had "a shot of alcohol" earlier in the day. She testified that, in addition to throwing the liquor bottle, she may have also thrown a water jug, but she did not remember clearly. K.G. testified she did not threaten Johnson or throw anything at her before seeing the knife in Johnson's hand.

2. *Sylvia*

Sylvia J., who knew Johnson by the name "Lovely," testified that she and her mother were in a car in the liquor store parking lot when Johnson

4

approached the car, saying she would pay them to give her a ride.[3]  Her mother refused and locked the car door.  Johnson approached the passenger door and again asked if she could get a ride.  When Sylvia refused, Johnson "took off running."  Sylvia noticed blood on Johnson's hand and on her clothes.  Sylvia went around the corner and saw K.G. sitting with her arms crossed across her chest, "trying to hold the blood that was coming out of her."  Sylvia took two of K.G.'s children across the street because she did not "want them seeing their mom like that."

   3.  *Eyewitnesses*

    a.  *N.C.*

K.G.'s seven-year-old daughter N.C. testified that Johnson and her mother used to be friends and that she loved Johnson, who was "like an auntie" to her.  N.C. remembered a time when she had to push Johnson "because [Johnson] had a knife in her hand and tried to cut [N.C.'s] mom."  N.C. was playing with her siblings and cousins down the street from a liquor store.  Her mother was there talking to another friend when Johnson came.  N.C. saw her mother throw a glass bottle at Johnson.  Then she saw Johnson chasing her mother "[a]round cars" with a knife in her hand.  Her mother did not have a knife.  N.C. was on top of the stairs when she pushed Johnson to try and get her away from her mother.  N.C. used two hands and pushed Johnson, and then Johnson pushed N.C. to the side using one hand.  Then N.C. saw Johnson "hurt [her] mom" with the knife and saw blood coming out from her mother's chest.  N.C. was upset and afraid when she saw Johnson coming at her mother with a knife.  She still thinks about the incident "a lot."

---

[3] Evidence established that Johnson had a tattoo on her leg with the word " 'Lovely.' "

b. *Carnell M.*

Carnell M. testified that K.G. was a friend of his, and Johnson was someone he recognized. He was behind the liquor store when Johnson stabbed K.G.[4] K.G. was drinking that day. He testified he did not see the "entire stabbing" and "didn't really know how it happened" because "it was behind [him]." He recalled speaking to police after the incident. A video of his conversation was captured on the officer's body worn camera and was played for the jury. Carnell told the officer that K.G. and Johnson were "usually best friends," but that day they were arguing. It "started like they [were] about to fight," but then Johnson "pulled a knife out." K.G. "started running from her." She ran behind a car and back around toward Carnell while Johnson ran after her. Johnson was "swinging the knife the whole time she was chasing her." K.G. fell trying to move her child out of the way, and Johnson stabbed her. Carnell called 911.

c. *Carla J.*

Carla testified that K.G. was a friend of hers but claimed she did not know Johnson. She said she was behind the liquor store that day but when she testified she claimed she did not see "what happened to K.G." and only "saw the aftereffects of what happened to her."[5] However, Carla spoke with officers at the scene immediately after the incident, and videos of her conversations captured on body-worn cameras were played for the jury.

---

[4] Carnell said that he usually drank alcohol every day, beginning in the morning, but had not drunk the day he testified and felt sick as a result.

[5] An investigator with the district attorney's office testified that, during an interview, Carla had told him she did not want to testify in court and was "afraid of being labeled a snitch," or someone who cooperates with law enforcement, and "afraid of putting herself . . . in danger."

Carla told an officer she "saw every goddamned thing." Carla said Johnson "chased [K.G.] up the way and stabbed her . . . [as] she was cornered." Carla told another officer she saw a "ho" named "Lovely" stab K.G. She described "Lovely's" hair style and attire. Carla said the women started fighting and "cussed each other out." Johnson walked away but came back "talking shit." K.G. "talk[ed] shit back to her," and then Johnson pulled out a knife. K.G. "jump[ed] up and trie[d] to run," but Johnson "cornered her" and stabbed her in front of "everybody." Carla said Johnson made a stabbing motion "four or five times," and said, "she tried to kill the girl in front of the kids."

Carla acknowledged that, on prior occasions, she had seen K.G. be "aggressive or violent" and testified she had previously seen an "altercation" between K.G. and the father of K.G.'s child.

### 4. *Law Enforcement and Medical Professionals*

A City of San Diego police officer testified that on the afternoon of June 14, 2018, he responded to a call regarding an assault with a deadly weapon and stabbing. He found K.G. sitting on a loading dock, "bleeding severely" from her chest. There was a knife nearby, and K.G. told the officer that Johnson had stabbed her with it. K.G. was transported by ambulance to a hospital.[6] After K.G. received medical treatment for her wound, she told the officer that Johnson had texted her the previous day and confronted her at the loading dock that afternoon, demanding money.

A detective obtained video surveillance footage of the incident from a location approximately 30 feet away from the loading dock area. The footage

---

[6] An emergency room physician testified that K.G. was actively bleeding from a laceration on her chest that was nearly six inches in length. The physician referred K.G. to the operating room for exploration and closure of the wound. Thirty staples were used to close the wound.

was played for the jury. The video is somewhat pixelated, and portions of the incident—particularly the final moments prior to the stabbing—are partially blocked from view and unclear. The video shows Johnson approaching the loading dock where K.G. was sitting, waving her arms in an animated manner, then chasing K.G. into the street while swinging at her with her right arm, chasing her up the loading dock steps, and swinging her arm in a stabbing motion.

Officers located and arrested Johnson one week later. She had a laceration on her left thumb but no other visible injuries. Officers collected a DNA sample from Johnson upon arrest.

The folding knife used in the stabbing was collected at the scene. No fingerprints were found on the knife, but DNA samples of bloodstains on the knife were analyzed—two from the handle and two from the blade. The blood on the knife's handle contained DNA from two people, one who contributed 99 percent of the DNA, and a second person who contributed one percent. K.G. was identified as the major contributor, but the identity of the second contributor could not be established conclusively. The blood collected from the left side of the blade consisted solely of K.G.'s DNA, while the blood from the right side of the blade contained a two-person DNA mixture with K.G. as the major contributor at 93 percent and Johnson as the minor contributor at seven percent.

5. *Evidence of the 2011 Stabbing of E.P.*

E.P. testified that Johnson stabbed him in February 2011. Johnson was dating E.P.'s stepbrother at the time, and they came to E.P.'s apartment. E.P. was outside with his children while they played. Johnson became angry when E.P. refused to share his marijuana, and they began arguing. At one point, E.P. turned to watch his children, and when he turned back, Johnson

8

stabbed him with a knife in the stomach, neck, and arm. E.P. promptly lost consciousness. He did not remember if Johnson said anything prior to stabbing him. E.P. regained consciousness five days later and spent a month in the hospital, where he underwent multiple surgeries. E.P. said he was "[t]errified" to testify with Johnson in the courtroom. Photos of his injuries were shown to the jury.

B. *Defense Case*

1. *Johnson*

Johnson testified on her own behalf. She stated that she became friends with K.G. when they were in school together. They lost contact but became reacquainted about a year before the incident, when Johnson "used to prostitute for [K.G.'s] brother." Johnson and K.G. spent time together every day, and Johnson thought of K.G. as her best friend. Johnson also spent time with K.G.'s children.

Johnson made money as a prostitute and would help K.G. by giving her money or buying food and clothes for her children. However, Johnson felt that K.G. spent the money improperly on alcohol or her "baby dad[dy]," rather than on her children. When Johnson refused to give K.G. money, K.G. would get upset and "cuss[] . . . and yell[]" at Johnson.

K.G. and her friends frequently congregated near the loading dock, and Johnson worked nearby as a prostitute. A few days before the incident, Johnson learned that K.G. and her children were sleeping on the street. Johnson had a motel room and offered to allow K.G. stay the night with her children if she was willing to split the cost of the room. K.G. agreed. That night, Johnson left the motel room to work as a prostitute, and when she returned after midnight, K.G. was not there, but her children were asleep in the room. After that, Johnson and K.G. only had contact via text or phone.

9

Johnson saw K.G. with her friends near the loading dock the afternoon of June 14. Johnson asked the group if they had seen a friend, and K.G. responded that she had not but she "heard [Johnson] was talking shit about [her] and [her] kids." Johnson walked away because she did not want to argue with K.G. "unless [K.G. was] going to give [Johnson] [her] money."

Johnson returned to the area about a half hour later. She testified that K.G. had been "drinking a lot" and was "belligerent now," and K.G. started yelling at Johnson and calling her "the B-word." Johnson said that, when she returned, she approached K.G., laughing at her, "[l]ike [K.G. is] broke, and I have money." They argued back and forth, saying derogatory things to each other. K.G. was sitting on the stairs, drinking brown liquor or brandy from a large bottle, over 10 inches tall. Johnson testified that "when K.G. drinks, she sometimes get[s] aggressive." Johnson told K.G. she was going to "fuck [K.G.'s] baby daddy and get the money," and K.G. stood up and came toward Johnson with the liquor bottle in her hand. At the bottom stair, K.G. "busted" the bottle on the ground and swung the broken bottle at Johnson.[7] K.G. nearly struck Johnson as she swung, coming within an inch or two of Johnson's chest. Johnson dropped her purse and flicked open the blade of her pocketknife, which she kept in her waistband for protection.

Johnson said the two then "squar[ed] off." K.G. moved backward, swinging the broken bottle, and Johnson moved forward, swinging her blade. Johnson said she swung at K.G. because K.G. broke the bottle and swung it first, and K.G. was "bigger than [her]." K.G. swung the bottle, and it "flew out of her hand" and struck Johnson's leg. K.G. then "darted towards the

---

[7] When shown a photograph of the scene, Johnson acknowledged she could not identify the broken bottle or pieces of glass K.G. allegedly broke off and swung at her.

10

street," and Johnson "darted towards her." Johnson said she felt scared and felt she needed to protect herself because she believed that K.G. had a combination padlock that "could be used to be a deadly weapon." However, Johnson acknowledged that K.G. had nothing in her hands as Johnson chased her and "swung [her] arm . . . with the knife once or twice."

As Johnson chased K.G. and swung the knife near the loading dock, the knife "flew out of [Johnson's] hand" onto the loading dock ramp. Johnson said she and K.G. both raced to the stairs, each trying to grab the knife first. Johnson believed K.G. would try to cut her with the knife if she got it first. K.G. got to the stairs first and Johnson "walk[ed] backwards a little bit" because K.G.'s friends were on the stairs. Johnson testified she was "like, lingering, but [she did not] know if [she] should like walk away or not." K.G. picked up a gallon water jug, lifted it over her head, and threw it at Johnson, striking her near her shoulder. Then K.G. "grab[bed] [N.C.] and push[ed] [N.C.] towards [Johnson]." Johnson "moved [N.C.] out [of] the way with [her] arm." By now, K.G. was at the top of the stairs. K.G. fell or dove and grabbed the knife and then "sliced [Johnson's] thumb" as Johnson moved N.C. out of the way. Johnson stated she wanted to "[g]et the knife away from [K.G.]" because she "was scared [K.G.] was going to cut [her] again." Johnson kicked and punched K.G. with a closed fist, "like a windmill hit," and grabbed the knife from K.G.'s hand. She "slic[ed]" K.G., dropped the knife, grabbed her purse, and walked away. Johnson heard K.G.'s friends yelling, and she began to run. She tried to get a ride to seek medical attention for her cut thumb. Eventually she called a friend for a ride and friends helped her bandage her hand. She did not call the police because she knew an arrest warrant for a parole violation had been issued. Johnson was arrested a week later "for [her] parole warrant." After she was jailed, she was sent for

11

medical treatment; the wound on her hand required surgery to repair a severed tendon.

Johnson testified that she was "worried about K.G. . . . with the knife" because she had seen her "get drunk, and then assault people." One time, K.G. got in a fight with someone she had been drinking with "and beat her up real bad." She had seen K.G. fight or strike other people on other occasions, both women and men.

Johnson also testified about the 2011 stabbing of E.P. She had known E.P. since she was 16 years old. In 2011, her female cousin—a minor—had run away from home and was staying with E.P. Her cousin texted around 2:00 or 3:00 in the morning saying "she had to bust open a window because [E.P.] locked her outside" when she was naked. Johnson told her cousin that she would come get her later after Johnson woke up. Johnson, who lived about four or five blocks away, left for E.P.'s house around 1 p.m. When Johnson arrived at E.P.'s, E.P. would not let her cousin get her things. Johnson and E.P. got in each other's faces and Johnson "pushed him out of [her] face," saying " 'Get out [of] my face.' " He "came back to [her] face," she pushed him again, and "he socked [her] in [her] eye," giving her a black eye.[8] Johnson "ended up swinging on him again," and he grabbed her, scratching her neck. She fell to the ground and pulled her knife from her purse. They "kept on fighting." Johnson said E.P. "was drunk and high" and "[h]e ran up on [her]" and "every time he ran up" she "swung and cut him." Someone told them to stop fighting, and E.P. lifted his shirt; Johnson realized he was badly cut and got scared, so she left. Johnson later told detectives she picked up a piece of glass from the ground and cut E.P. with it; in her testimony, Johnson

---

[8]     Photographs of Johnson with a black eye, taken February 14, 2011, were shown to the jury.

12

admitted she lied to detectives because she actually stabbed E.P. with a knife. She was arrested and convicted of felony assault with a deadly weapon for E.P.'s stabbing. When asked at trial about the prior and current offenses, Johnson explained that the prior offense "was like unreasonable self-defense" because E.P. did not have a weapon when he "got physical" with her—but Johnson "felt like it was complete self-defense" with K.G. because K.G. "had a weapon." Johnson also stated that she "was really afraid [for her] life" because K.G. "had a weapon on [Johnson]."

### 2. *John H.*

John H. lives near the loading dock. On June 14, he heard "a lot of commotion" and "arguing." He looked out his apartment window—across the street—and saw two women he recognized. He did not know them by name, but he knew K.G. and her children because he had known K.G.'s mother and he knew Johnson from the neighborhood. He "did not see an attempted murder" and did not see "nobody trying to stab nobody." He saw Johnson "probably desperate to keep somebody from hurting them" and "trying to defend themselves from a monster." He said K.G. had "a stick or something in her hand or she was throwing something." "[S]he would back it up and she tripped and fell," and "the other woman was coming toward her." "[T]he woman with the ponytail [Johnson] just walked up," "[a]nd it was like . . . she was slicing," "[a]nd then she turned and walked away . . . and then all of the sudden, all these police came." He did not leave his apartment when the police arrived and the police did not come to his apartment to question him.

### C. *Rebuttal Testimony*

The prosecutor recalled K.G. to testify, and she denied drinking from a large 10-inch bottle of liquor at the time of the incident. She said the bottle she threw at Johnson was "small," about six inches long. K.G. denied

13

breaking the bottle before throwing it. She denied Johnson's claim that the knife flew from Johnson's hand and said the only time she saw the knife out of Johnson's hand was "after [K.G.] was cut." She denied having a lock on her and denied pushing N.C. toward Johnson.

D. *Closing Arguments*

The prosecutor argued that Johnson's statement to K.G. that she was " 'going to kill [her],' " and her actions of chasing and stabbing K.G. in a vulnerable part of her body, her chest, showed an intent to kill. The prosecutor argued that a cold, calculated decision to kill can be reached quickly, and that here, Johnson's testimony that she considered walking away, but then continued pursuing K.G. with the knife before stabbing her in the chest demonstrated that the attempt to kill was deliberate and premeditated. The eyewitnesses' statements to the police at the time of the incident were credible, even if it was clear that Carnell and Carla did not want to testify in court.

The defense argued that the evidence did not support the inference that Johnson intended to kill K.G. Instead, the evidence showed that Johnson was angry with K.G. and became fearful when they began to fight, and Johnson defended herself against K.G., who Johnson believed was drunk and violent and possibly armed with a padlock she could use as a weapon.

E. *Conviction and Sentencing*

The jury convicted Johnson on all counts: attempted murder (Pen. Code, §§ 187, subd. (a), 664; count 1), assault with a deadly weapon (*id.*, § 245, subd. (a)(1); count 2), and cruelty to a child by inflicting injury (*id.*, § 273a, subd. (b); count 3). The jury also found true the allegation that the attempted murder was willful, deliberate, and premeditated (*id.*, § 189). In a bifurcated proceeding, the trial court found true prior strike (*id.*, §§ 667,

14

subds. (b)-(i), 668, 1170.12) and prior serious felony conviction (*id.*, §§ 667, subd. (a)(1), 668, 1192.7, subd. (c)) allegations. The trial court sentenced Johnson to a determinate term of nine years[9] plus an indeterminate term of life imprisonment with the possibility of parole for the premeditated attempted murder. The trial court additionally imposed and stayed a concurrent 12-year term for count 2 (*id.*, § 654) and imposed a term for count 3 but gave credit for time served.

## DISCUSSION

### I.

### *Evidence of Uncharged Acts*

Johnson contends the trial court erred when it allowed the prosecution to introduce evidence of the 2011 stabbing incident under section 1101, subdivision (b). She contends the evidence was more prejudicial than probative under section 352 and that admitting the evidence deprived her of her constitutional right to due process.

A. *Additional Background*

Prior to trial, the prosecution moved to admit evidence of the 2011 stabbing of E.P., for which Johnson was convicted of assault with a deadly weapon and sentenced to five years in prison. The prosecutor represented that, in the 2011 stabbing incident, Johnson told E.P. she was going to kill him. The prosecution argued the prior offense was substantially similar to the current offense, it was relevant and admissible to prove Johnson's intent in stabbing K.G., and the high probative value of the prior stabbing incident

---

9    The nine years was comprised of one year for the personal use of a dangerous and deadly weapon enhancement (Pen. Code, § 12022, subd. (b)(1)), three years for the personal infliction of great bodily injury enhancement (*id.*, § 12022.7, subd. (a)), and five years for the prior serious felony conviction (*id.*, § 667, subd. (a)(1)).

was not substantially outweighed by its prejudicial effect. The defense argued the evidence was prejudicial and the jury would use it improperly as propensity evidence.

At the motion in limine hearing, the trial court agreed the evidence was "very probative" but indicated it usually does not allow such evidence to be admitted because the jury might "use it for propensity, especially when the . . . assaultive behavior is identical."[10] The prosecutor argued the evidence was admissible to prove intent—because Johnson told each victim she intended to kill them before each stabbing—and to show that Johnson did not stab K.G. in self-defense. Defense counsel requested that the court conduct a section 402 hearing if it was considering allowing the evidence of the prior offense to be admitted.

The trial court agreed to hold a section 402 hearing. The court informed the parties that it would not allow any evidence for purposes of propensity, but the evidence could be offered for "some other fact [at] issue, such as intent, absence of mistake, and so forth."

At the hearing, the prior stabbing victim (E.P.) testified that Johnson was dating his stepbrother at the time of the offense. On February 13, 2011, Johnson and the stepbrother visited E.P.'s apartment. When E.P. was outside with his two young children, he and Johnson got into an argument, but E.P. could not recall what it was about. At one point, E.P. turned to

---

10    The trial court expressed a general reluctance to admit evidence under section 1101, subdivision (b), stating: "I have sincere concerns always when an 1101(b) is being offered that it's more prejudicial than probative because it is hard to say, 'Tell them not to use it for propensity.' And I have a fear that they will use it for propensity, especially when the—the assaultive behavior is identical, a knife, somewhere on someone else's body. [¶] So I usually don't allow it."

16

check on his children who were five feet away. When he turned back, Johnson stabbed him in the stomach, neck, and arm with a knife. E.P. did not recall what, if anything, Johnson said to him before or after she stabbed him. As a result of his injuries, E.P. spent a month in the hospital and underwent multiple surgeries. E.P. stated he did not want to testify because he was afraid for his life and he was concerned that Johnson would hurt him in retaliation.[11]

After E.P.'s testimony, the prosecution reiterated the argument that the incidents were very similar and the prior incident was highly probative of Johnson's intent and the absence of mistake or accident in the current incident. The defense argued the evidence was highly prejudicial and irrelevant to show intent in the subsequent incident. The trial court ruled that, based on the similarities between the two incidents, the court would allow evidence of the prior stabbing to show Johnson's intent and the absence of mistake or accident in this case.

E.P.'s testimony at trial, which is detailed *ante*, largely tracked his statements at the section 402 hearing, except that he recalled that he and Johnson argued about E.P.'s failure to share marijuana. In addition, E.P. testified regarding his condition after the stabbing and photographs of his injuries were introduced as evidence.

The jury was instructed:

> "You may consider [the evidence of the 2011 stabbing of E.P.] only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged act. [¶] . . . [¶]

---

[11] The record indicates that Johnson laughed out loud when E.P. testified he did not want to testify because he was afraid for his life.

17

"If you decide that the defendant committed the uncharged act, you may, but are not required to, consider that evidence for the limited purpose of deciding whether the defendant acted with the intent to kill [K.G.] in this case; or the defendant's alleged actions were not the result of a mistake or accident.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged act and the charged offenses.

"Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's intent or absence of mistake or accident.

"Do not conclude from this [evidence] that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant committed the uncharged act, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charge[d] in Counts 1-3 or that any allegations have been proved. The People must still prove each charge and allegation beyond a reasonable doubt." (See CALCRIM No. 375.)

The jury was also instructed that, to prove Johnson was guilty of attempted murder, the prosecution must prove that she took at least one direct but ineffective step toward killing another person and that she intended to kill that person. (CALCRIM No. 600; see Pen. Code, §§ 187, 664.) The jury was instructed that, to find Johnson guilty of willful, deliberate, and premeditated attempted murder, it was required to find that she "*intended to kill* when she acted," "carefully weighed the considerations for and against her choice and, *knowing the consequences*, decided to kill," and "decided to kill before completing the act of attempted murder." (See CALCRIM No. 601; Pen. Code, §§ 187, 189, 664.) The jury was additionally instructed on self-

18

defense as a defense to the charges of attempted murder and assault with a deadly weapon.[12]

During closing arguments, both parties discussed the limited purpose of the evidence of the prior stabbing. The prosecutor stated, "we're not saying that this is—she did it before or she did it again. That's not what this evidence is for. This evidence is specifically to prove that when the defendant acted on June the 14th of 2018, that she intended to kill [K.G.]. And you consider what she did to [E.P.], seeing if she intended to kill [K.G.]. [¶] And you also consider this prior stabbing incident as evidence to show that . . . what the defendant did with [K.G.] on June 14, 2018, was not the result of a mistake or an accident. That [Johnson] wasn't having to act in self-defense for a second time against a second individual that she stabbed." Defense counsel similarly admonished the jury, "Now, you cannot use that to say, Well, if she did it once, she did it again."

B. *Applicable Law*

Evidence of other crimes or bad acts is inadmissible when offered to show that a defendant had the criminal disposition or propensity to commit the crime charged. (§ 1101, subd. (a).) However, " ' " '[O]ther crimes' evidence is admissible under . . . section 1101, subdivision (b) 'when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes.' " [Citation.] "In this inquiry, the degree of similarity of criminal acts is often a key factor, and 'there exists a continuum concerning the degree of

---

[12]     The trial court instructed the jury with CALCRIM No. 3470 (which applies in non-homicide cases) rather than CALCRIM No. 505 which contains "a correct statement of the law" in the context of an attempted murder charge. (*People v. Waxlax* (2021) 72 Cal.App.5th 579, 591 (*Waxlax*).)

similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: "The least degree of similarity . . . is required in order to prove intent . . . ." . . . By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity.' " ' " (*People v. Scully* (2021) 11 Cal.5th 542, 586 (*Scully*).)

If the court determines the evidence is relevant and admissible under section 1101, subdivision (b), the court must next determine whether the probative value of the evidence is substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*); § 352.)

" ' "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668.) "We will not disturb its ruling on appeal absent a showing that it exercised its discretion in an arbitrary manner resulting in a manifest miscarriage of justice." (*Scully*, *supra*, 11 Cal.5th at p. 587.)

C. *Analysis*

Johnson contends evidence of the prior stabbing was erroneously admitted because it was not relevant to show Johnson's intent to kill, and the evidence was more prejudicial than probative. It is unnecessary for us to decide whether the trial court abused its discretion in admitting evidence of the prior offense because any assumed error was harmless on this record.

"The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211.) As our Supreme Court has explained: "The least

degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. . . .   In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)  " ' "The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." ' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1306 (*Chism*).)

Some aspects of the prior and current offenses here were similar:  In both incidents, Johnson knew the victim; was angry with the victim; went to the victim's location with a knife; had a verbal argument with the victim; stabbed the victim in the center mass of the body while the victim was unarmed and while the victim's children were nearby; and immediately fled the scene after the stabbing.  And in both instances, Johnson asserted she acted in self-defense.  Based on these similarities, the jury could reasonably reject Johnson's claim in the charged offense that she stabbed K.G. in self-defense (see, e.g., *People v. Cortes* (2011) 192 Cal.App.4th 873, 916; *People v. Vidaurri* (1980) 103 Cal.App.3d 450, 457-459), and instead conclude that she acted intentionally and deliberately executed a planned attack on her friend. (See *People v. Pearson* (2013) 56 Cal.4th 393, 443 [" 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' "].)  However, because the prior offense was remote in time and there was no significant nexus between the two victims or the two offenses, there was some risk that the prior offense impermissibly painted the defendant as someone who was predisposed to violence.  (See *People v. Dryden* (2021) 60 Cal.App.5th 1007,

21

1020-1021 (*Dryden*) [evidence of defendant's assault during an altercation with his father did "not increase the probability that defendant fabricated a self-defense claim [six] years later under entirely different circumstances" against a group of strangers]; cf. *Vidaurri*, at pp. 457-459 [prior incident in which defendant threatened security guards with a knife was admissible to "rebut defendant's contention [as to present crime] that he drew his knife only in self-defense" approximately two months later].)[13]

It is unnecessary for us to resolve whether the trial court erred in admitting evidence of Johnson's prior stabbing under section 1101, subdivision (b). Even assuming that an error occurred, there is no reasonable probability the jury would have reached a more favorable verdict had the evidence of the prior stabbing been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [error is reversible if there is a reasonable probability that a result more favorable to defendant would have been reached in absence of error]; *People v. Felix* (2019) 41 Cal.App.5th 177, 187 [applying *Watson* harmless error test to consideration of evidence pursuant to sections 1101 and 352].)

The central disputed issue here was whether Johnson stabbed K.G. in self-defense. As previously noted (see fn. 11, *ante*), the jury was instructed with CALCRIM No. 3470 (applicable to non-homicide offenses) rather than CALCRIM No. 505 (applicable to attempted murder). "The difference between CALCRIM No. 3470 and CALCRIM No. 505—that is, the difference between self-defense in the homicide context and self-defense that will justify an assault—lies in the type of the threat the defendant believed they faced.

---

13    "No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible," and "significant similarities between the prior and the charged offenses may 'balance[ ] out the remoteness.'" (*People v. Branch* (2001) 91 Cal.App.4th 274, 284-285.)

To justify a homicide or attempted homicide, the defendant must believe that 'danger' or 'great bodily harm' is imminent, whereas an assault committed in self-defense may be justified if the defendant feared that any 'bodily injury,' or even an 'unlawful touching,' was imminent." (*Waxlax*, *supra*, 72 Cal.App.5th at pp. 591-592.)[14] "For both homicide and assault, the amount of force the defendant uses must be no more than reasonably necessary to fend off the perceived threat." (*Id.* at p. 592.) And the defendant must *actually believe* in the need to defend herself against the imminent peril. (See *People v. Horn* (2021) 63 Cal.App.5th 672, 682; *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.)

Even without evidence of the prior offense involving E.P. in 2011, the evidence negating Johnson's claim of self-defense in the instant case was overwhelming. The remaining evidence convincingly undermined Johnson's testimony that she was in fear of any imminent danger. The surveillance video showed Johnson approaching the loading dock where K.G. was sitting, waving her arms in an animated manner, then chasing K.G. into the street while swinging at her with her right arm, chasing her up the loading dock

---

14    Neither party has addressed whether the jury should have been instructed with CALCRIM No. 505 under the circumstances of this case— where the defendant was charged with both attempted murder and non-homicide offenses, and the defendant claimed she feared for her life because the victim had a combination padlock that "could be used to be a deadly weapon." (See *Waxlax*, *supra*, 72 Cal.App.5th at p. 592 [trial court did not err in instructing jury solely with CALCRIM No. 505 where "the evidence did not implicate the difference between the two types of self-defense" because the defendant "provided the same justification for the attempted murder charge as he did for the assaults"—namely, that "he feared great bodily harm" rather than "an unlawful touching or a simple injury"].) We take no position on whether the court correctly instructed the jury here by only using CALCRIM No. 3470.

steps, and swinging her arm in a stabbing motion. All three eyewitnesses testified that Johnson was armed with a knife and chased and stabbed K.G. Seven-year-old N.C. testified that Johnson chased and cut her mother with a knife. N.C. acknowledged her mother threw a bottle at Johnson but testified her mother did not have a knife. N.C. said she tried to push Johnson away because Johnson was trying to cut her mother, but Johnson pushed N.C. out of the way and stabbed her mother. Both Carnell and Carla testified that the women were arguing verbally; Johnson pulled a knife, K.G. tried to run away, and Johnson chased and stabbed her. Even Johnson's defense witness testified that K.G. "tripped and fell," while Johnson "was coming toward her," and that Johnson "just walked up," "slic[ed]" K.G., and "turned and walked away." Johnson claimed that she feared for her life during the argument with K.G., but her own testimony of her purported fear is not dispositive. (*In re Christian S.* (1994) 7 Cal.4th 768, 783 ["[W]hether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts. It is not required to accept the defendant's bare assertion of such a fear."].)

Even assuming Johnson actually believed she was in imminent danger, the jury could conclude she used more force than reasonably necessary under the circumstances. (See *People v. Hardin* (2000) 85 Cal.App.4th 625, 630 [self-defense is not available where defendant exceeds the amount of force necessary in view of the nature of the attack].) Although Johnson claimed that she only pulled her knife after K.G. swung a broken bottle at her, when shown photographs of the scene, Johnson acknowledged there was no evidence of the broken bottle K.G. allegedly used—and the jury could reasonably reject Johnson's testimony that K.G.'s friends must have removed the evidence before the police arrived. Notably, Johnson also repeatedly

24

acknowledged that she chased K.G., swinging the knife at her, while K.G. was unarmed. Johnson further admitted that she considered walking away from the altercation before she chased K.G. up the stairs with a brandished knife and "sliced" her. And Johnson fled from the scene after stabbing K.G., which demonstrated a consciousness of guilt and further negated her claim of self-defense. (See *People v. Anderson* (2018) 5 Cal.5th 372, 391; *People v. Turner* (1990) 50 Cal.3d 668, 694, fn. 10 ["The prosecution theorized that defendant intended to murder and rob the victim. Defendant claimed an unintentional killing in self-defense and also denied an intent to steal. Under these circumstances, the prosecution was entitled to use evidence of guilty flight to help prove defendant's criminal state of mind."].)[15]

Finally, we reject Johnson's claim that admission of the evidence violated her due process rights. "The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates "fundamental conceptions of justice." ' [Citation] For the erroneous admission of evidence to amount to a denial of due process, the evidence must have been ' "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." ' " (*Dryden*, *supra*, 60 Cal.App.5th at pp. 1025-1026.) For reasons already discussed, *ante*, we conclude this "standard has not been met here." (*Id.* at p. 1026.) In sum, the central issue in dispute was whether Johnson stabbed K.G. in self-defense; there was overwhelming evidence of defendant's guilt

---

[15] The jury was instructed in relevant part, "If the defendant fled immediately after the crime was committed or after she was accused of committing the crime, that conduct may show that she was aware of her guilt." (See CALCRIM No. 372.)

even absent the other-crimes evidence—including testimony from multiple witnesses (and the defendant herself) that she chased after K.G. with a drawn knife while K.G. was unarmed; and there was no reasonable probability that Johnson would have obtained a more favorable result absent the assumed error. We therefore reject Johnson's due process claim. (See *People v. Westerfield* (2019) 6 Cal.5th 632, 700 [even assuming trial court erred in allowing evidence prohibited by § 1101, subd. (a), defendant did not establish such assumed error "resulted in a fundamentally unfair trial that offends due process"].)

## II.

### *Newly Discovered Evidence*

After trial but before sentencing, Johnson filed a motion for a new trial based on newly discovered evidence that, one week before trial, K.G. "violently attacked and robbed a woman on a city bus." (Pen. Code, § 1181, subd. (8).) The trial court denied the motion. Johnson contends that the prosecution's failure to disclose an assault incident in which K.G. was the aggressor violated her rights, prevented her from presenting a complete defense, and deprived her of her ability to effectively confront and cross-examine K.G. (*Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*).) Johnson further contends the trial court erred when it denied her motion for a new trial based on the new evidence.

A. *Additional Background*

Police reports reflect that, on October 2, 2019—six days before Johnson's trial began—K.G. verbally and physically assaulted a woman on an MTS bus. The incident was captured on MTS bus surveillance footage. Two of K.G.'s children were present during the incident. During the assault, K.G. pushed the woman, struck her with open hands and closed fists, kicked

26

her in the head, and struck her in the head with a backpack. K.G. also broke the woman's cell phone and took her baseball cap, which was worth about $40. As she struck the victim, K.G. yelled, " 'over my brotha,' " and called the victim a " 'punk ass' " and " 'Dyke ass bitch.' "[16] K.G.'s child told her, "[M]omma, stop, stop." After the attack, K.G. and her children exited the bus. The bus driver reported the incident to the police. The victim provided a description of K.G. but did not disclose her name.

On October 8, 2019—the day Johnson's trial began—the detective assigned to K.G.'s assault case reviewed the MTS bus surveillance footage. He recognized K.G. from a previous contact but could not remember her name. Sometime between October 8 and 15, the detective determined K.G.'s identity and on October 15, compiled a six-pack photographic lineup that included her image. On October 21—the day before the jury rendered its verdict in Johnson's case—the victim identified K.G. as the person who had assaulted her on the bus. According to the investigating detective, K.G. made false and misleading statements about the incident when she was interviewed. K.G. was arrested on October 23 and was charged with robbery, assault with force likely to produce great bodily injury, and misdemeanor vandalism. She pled guilty to the felony assault charge and received probation. The prosecutor did not inform defense counsel about the incident until after K.G. was arrested—which was one day after the jury had rendered its verdict in Johnson's case.

In support of her motion for a new trial, Johnson argued that evidence of K.G.'s violent attack of the woman on a bus supported Johnson's self-

16 According to the police report attached to Johnson's new trial motion, K.G. claimed the victim of the assault had previously threatened to kill K.G.'s brother (who later committed suicide), and started " 'talking shit' " to K.G.

27

defense claim and cast doubt on K.G.'s credibility. Johnson further argued the evidence would have caused at least one juror to reach a different conclusion at trial, specifically with respect to the Penal Code section 189 allegation that the attempted murder was willful, deliberate, and premeditated.

Prior to sentencing Johnson, the trial court heard argument on her new trial motion. Johnson argued the newly discovered evidence of K.G.'s assault was material because "it goes to [K.G.'s] veracity and to her character." The evidence showed that K.G. had lied to police and denied any involvement in the bus assault. K.G.'s veracity was crucial "because she was the only person to testify during the trial to the statement by Ms. Johnson of 'bitch, I'm going to kill you.' And that was integral in the People's argument for the [Penal Code section 189] allegation." Johnson further argued that evidence of K.G.'s assault of a woman on the bus was admissible to show her character for violence, which was crucial in this case where "[K.G.] was held out to be a non-violent person."

The prosecutor explained that she had not learned of the assault until after trial, when she called K.G. to inform her of the verdicts. The prosecutor argued that although K.G. had committed an assault, she did not use a weapon other than a backpack (such as a knife or a padlock). The prosecutor further argued that, aside from K.G.'s testimony, there was ample evidence of Johnson's intent to kill from the surveillance video footage and the testimony of three eyewitnesses, and that evidence of K.G.'s assault would not change the outcome of a new trial.

Initially, the trial court described the evidence as "a specific instance of conduct" and rhetorically asked whether the evidence would have been admissible at trial. After defense counsel referred to section 1103, the trial

28

court added that it likely would have excluded the evidence under section 352 because introducing evidence of the assault would require "a trial within a trial."[17] Ultimately, the trial court found that if evidence of K.G.'s assault was presented to a jury, it would not cause "one juror to think differently about this case." The court explained that evidence that K.G. had assaulted someone under different circumstances is "not going to be able to necessarily overcome what's clearly visible in this particular case on the video and with percipient witnesses. Whether [K.G.] was violent or not before this particular situation in this case is less valuable because on that particular day there are multiple witnesses who saw that Ms. Johnson was the aggressor on that day. Ms. Johnson was the one that came fired up with a knife. Ms. Johnson was the one who chased [K.G.] in the street. There was an allegation that [K.G.] threw . . . a small bottle of wine at her at some point but not necessarily as an instigator." The court found that "there is no way the jury can actually ignore all of that." The court observed that "there was no evidence on that day that [K.G.] was the aggressor," and "[t]he evidence all pointed to [Johnson] being the aggressor." Based on the foregoing, the trial court found the outcome at trial "wouldn't have changed" with the evidence of K.G.'s assault and denied the motion for new trial.

B. *Applicable Law*

A criminal defendant has a due process right to pretrial discovery of information favorable to his defense. (*Brady*, *supra*, 373 U.S. at p. 87.) The

---

17    Evidence of a crime victim's character is admissible if "[o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character." (§ 1103, subd. (a)(1); see *People v. Wright* (1985) 39 Cal.3d 576, 587 [" 'It has long been recognized that where self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible.' "].)

government has a constitutional duty to disclose both exculpatory evidence that casts doubt on the defendant's guilt and impeaching evidence that calls into question the credibility of government witnesses. (*Strickler v. Greene* (1999) 527 U.S. 263, 280-282 (*Strickler*).) The *Brady* rule "extends to evidence known to others acting on the prosecution's behalf, including the police." (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709; see *People v. Robinson* (1995) 31 Cal.App.4th 494, 499 (*Robinson*) ["The scope of a prosecutor's disclosure duty includes not just exculpatory evidence in *his* possession but that possessed by investigative agencies to which he has reasonable access."].) Moreover, "[t]he duty to provide discovery is not limited to the time before trial; discovery is an ongoing responsibility, which extends throughout the duration of the trial and even after conviction." (*People v. Kasim* (1997) 56 Cal.App.4th 1360, 1383-1384.)

" ' "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." [Citation.] Prejudice, in this context, focuses on "the materiality of the evidence to the issue of guilt and innocence." [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction "more likely" [citation], or that using the suppressed evidence to discredit a witness's testimony "might have changed the outcome of the trial" [citation]. A defendant instead "must show a 'reasonable probability of a different result.' " ' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176 (*Letner and Tobin*).)

On appeal, the defendant bears the burden to establish the components of a *Brady* violation.  (*Strickler*, *supra*, 527 U.S. at pp. 289, 291.)  We independently review whether such a violation occurred but give "great weight to any trial court findings of fact that are supported by substantial evidence."  (*Letner and Tobin, supra*, 50 Cal.4th at p. 176.)

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors:  ' "1.  That the evidence, and not merely its materiality, be newly discovered; 2.  That the evidence be not cumulative merely; 3.  *That it be such as to render a different result probable on a retrial of the cause*; 4.  That the party could not with reasonable diligence have discovered and produced it at the trial; and 5.  That these facts be shown by the best evidence of which the case admits." ' "  (*People v. Delgado* (1993) 5 Cal.4th 312, 328, italics added.)  "[W]hen a defendant makes a motion for a new trial based on newly discovered evidence, [s]he has met [her] burden of establishing that a different result is probable on retrial of the case if [s]he has established that it is probable that at least one juror would have voted to find [her] not guilty had the new evidence been presented."  (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521.)

C.  *Analysis*

There is no real dispute that the suppression component of *Brady* is met here.  The prosecutor had a duty to disclose the assault involving K.G. during trial even if the prosecutor was actually unaware of the information until after the verdicts were rendered.  (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 419 ["suppression occurs when the government withholds evidence either willfully or inadvertently"], see *Strickler, supra*, 527 U.S. at pp. 281-282.)  Officers identified K.G. as the suspect in the

31

assault sometime between October 8 and 15, during the pendency of trial, and the victim identified K.G. as her attacker on October 21, the day before the jury rendered its verdict. Because law enforcement was aware of the assault, the evidence was in the prosecution's possession during the trial. (*Robinson, supra*, 31 Cal.App.4th at p. 499.)

In addition, the parties do not dispute that the evidence was favorable to the defense. Under section 1103, subdivision (a)(1), a defendant may introduce evidence that the victim had a propensity for violent aggression to support the inference that the victim was the aggressor in their altercation—forcing the defendant to resort to deadly self-defense. (*People v. DelRio* (2020) 54 Cal.App.5th 47, 54.)

The parties dispute whether the requirements of materiality and prejudice are met here. Johnson argues that, had evidence of K.G.'s tendency for violence been admitted at trial, Johnson could have persuaded at least one juror that she was not guilty at least with respect to the allegation that the attempted murder was willful, deliberate, and premeditated. She argues, "The prosecution was permitted to present [K.G.] as a non-violent person who was only caring for her children at the time of the incident, and who was attacked by [Johnson] without provocation in front of her children. In fact, the evidence the jury did not hear showed that [K.G.] was willing to lash out and violently attack and even rob other people in front of her children. The jury should have been presented with the evidence of [K.G.]'s actions on the MTS bus that occurred one week before [Johnson's] trial. Had the jury been provided with that evidence, it is reasonably probable that at least one of the jurors would have found [Johnson] not guilty of attempted first-degree murder." The Attorney General argues that, "given the strength of the evidence refuting [Johnson's] self-defense claim and establishing her guilt, a

32

different result was not reasonably probable" even if evidence of K.G.'s assault was presented to the jury on retrial. We agree with the Attorney General.

Although "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called '*Brady* material' . . . strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (*Strickler*, *supra*, 527 U.S. at p. 281; accord *Letner and Tobin*, *supra*, 50 Cal.4th at p. 176.) "The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. [Citations.] It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.] Further, it is a probability that is, as it were, 'objective,' based on an 'assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision,' and not dependent on the 'idiosyncrasies of the particular decisionmaker,' including the 'possibility of arbitrariness, whimsy, caprice, "nullification," and the like.' " (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)

Johnson contends the evidence was material because it would have countered the "characterization of [K.G.] as a peaceful person," and it would have impeached K.G.'s credibility. But K.G. was already portrayed in part as non-peaceful. The jury was presented with evidence that K.G. had been drinking in the presence of her children the day of the incident, and Johnson testified that K.G. "sometimes gets aggressive" when she drinks. Another witness testified she had seen K.G. be "aggressive or violent" on prior

occasions, corroborating Johnson's testimony that K.G. sometimes acted aggressively. Moreover, " 'impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citation]. In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony." ' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1050.) Here, even without K.G.'s testimony, there was overwhelming evidence that Johnson was the aggressor. As previously discussed, all three eyewitnesses testified that Johnson was armed with a knife and chased and stabbed K.G. Johnson's own witness testified that K.G. "tripped and fell" while Johnson "was coming toward her," and that Johnson "just walked up," "slic[ed]" K.G., and "turned and walked away." Johnson repeatedly acknowledged that she chased K.G., swinging the knife at her, while K.G. was unarmed, and she considered walking away from the altercation before chasing K.G. again, stabbing her, and then fleeing the scene.

This same evidence—including Johnson's decision to arm herself with a knife before approaching K.G., arguing with her, and ultimately chasing and stabbing her while she was unarmed—supports the allegation that the attempted murder was willful, deliberate, and premeditated. Even without K.G.'s testimony that Johnson threatened to kill her, the evidence demonstrates Johnson was acting based on " ' "preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*People v. Burney* (2009) 47 Cal.4th 203, 235.) Armed, Johnson pursued as K.G. retreated, chasing her between cars, back up the stairs, and onto the landing. K.G. tripped and fell, but Johnson continued, knife in hand, and was undeterred

34

when young N.C. attempted to push her away. (See *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1116 [that defendant had multiple "opportunities to turn back" before pursuing his wife with a knife in hand supported a reasonable inference that he was "*already* resolute on the use of deadly force"]; *People v. Memro* (1995) 11 Cal.4th 786, 863 [jury could infer defendant "considered his options" as he ran toward a victim standing 178 feet away].) One eyewitness saw Johnson "swinging the knife the whole time she was chasing [K.G.]"; another watched as Johnson "cornered" and stabbed K.G. Having sliced the back of K.G.'s shirt early in the chase, Johnson twice slashed K.G.'s chest while standing over her, suggesting " 'a reasoned decision to kill.' " (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1293.) In light of this evidence of premeditation and deliberation, and ample evidence already presented as to K.G.'s violent tendencies, we conclude Johnson has not shown a " ' " 'reasonable probability of a different result' " ' " if the jury heard about an unrelated assault against a woman on a bus who K.G. claimed had previously threatened her brother. (*Letner and Tobin*, *supra*, 50 Cal.4th at p. 176.) The undisclosed evidence would not have "put the whole case in such a different light as to undermine confidence in the verdict." (*In re Miranda* (2008) 43 Cal.4th 541, 575.)

Similarly, we reject Johnson's claim that the trial court's refusal to grant her motion for a new trial based on the newly discovered evidence of K.G.'s assault incident constitutes an abuse of discretion. Johnson argues that she met her burden to establish a different result is probable on retrial because it is reasonably likely that at least one juror would have found K.G. unreliable. For the reasons discussed in our *Brady* analysis, we conclude it is not reasonably probable Johnson would obtain a more favorable result if the case were retried and she could use the evidence of K.G.'s violent conduct.

35

III.

*Cumulative Error*

Johnson contends that, even if the asserted errors individually do not warrant reversal, the cumulative effect of them does. "A predicate to a claim of cumulative error is a finding of error. There can be no cumulative error if the challenged rulings were not erroneous." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) "To the extent there are instances in which we have found error or assumed its existence, we have concluded no prejudice resulted. We do not find reversible error by considering the claims cumulatively." (*Chism, supra*, 58 Cal.4th at p. 1309; see *Scully, supra*, 11 Cal.5th at p. 613 ["the cumulative effect of the three assumed errors and one harmless error does not warrant reversal"].) We therefore reject Johnson's claim that her trial was fundamentally unfair. (*People v. Rivera* (2019) 7 Cal.5th 306, 348; *People v. Stewart* (2004) 33 Cal.4th 425, 522.)

IV.

*Recently Amended Section 654*

At sentencing, the trial court denied Johnson's *Romero* motion to dismiss her prior strike offense.[18] The judge remarked that Johnson was "not a person [who] falls outside the scheme of *Romero* and [*People v.*] *Williams* [(1998) 17 Cal.4th 148] because of the previous horrific attack on the previous victim and then the victim in this case. It's just not the case where I can see myself striking the strike, so that motion is denied." Initially, the court selected a low term and remarked, "I'm giving her a break" and "I'm going to give her the least possible." However, it subsequently declared the sentence initially imposed to be unauthorized,

---

18    *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

recalled it, and imposed a new sentence.[19]  For count 1, premeditated attempted murder, the trial court sentenced Johnson to an indeterminate term of life with the possibility of parole (Pen. Code, §§ 187, 189, subd. (a), 664, subd. (a)), plus a determinate sentence of nine years, comprised of one year for the personal use of a dangerous and deadly weapon (*id.*, § 12022, subd. (b)(1)), three years for the personal infliction of great bodily injury (*id.*, § 12022.7, subd. (a)), and five years for the prior serious felony conviction (*id.*, § 667, subd. (a)(1)).[20]  The trial court acknowledged it had discretion to strike the enhancements, but declined to do so "because of the prior strike conviction and its similarity to the current offense, the defendant's failure to be rehabilitated or deterred by the punishment on the prior, the danger she presents to the community, and the fact that the jury rejected the defendant's argument that she acted in self-defense."  For count 2, assault with a deadly weapon, the trial court selected the upper term, remarking, "[I]t doesn't make sense for me to offer the low term of two years because this is going to be stayed pursuant to [Penal Code section] 654.  [¶]  But the logic behind why I picked the upper term is because the great bodily injury and the weapon used was found to be true."  Thus, the court imposed a 12-year term, comprised of the upper term of four years for the assault doubled for the prior strike

---

[19]     The recalled sentence conflated determinate and indeterminate terms.  Upon resentencing, the trial court remarked, "I do decline at this time to revisit the issue and make it less.  I will not make less of a sentence."  Aside from Johnson's contention that she is entitled to resentencing under Assembly Bill No. 518, she does not challenge the sentence imposed.

[20]     With respect to the indeterminate term, the court stated that Johnson must serve a minimum of 14 years before being eligible for parole and described the term imposed as an indeterminate term of 14 years to life.  (Pen. Code, §§ 3046, subd. (a), 667, subd. (e)(1).)

offense, plus an additional four years for the enhancements. The court stayed imposition of this sentence pursuant to Penal Code section 654.[21]

"[Penal Code section] 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) When Johnson was sentenced, the statute required the trial court to impose the sentence that "provides for the longest potential term of imprisonment" (former Pen. Code, § 654, subd. (a)) and stay any shorter sentences. Effective January 1, 2022, the statute was amended to provide that "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Pen. Code, § 654, as amended by Stats. 2021, ch. 441, § 1 (Assem. Bill No. 518).) As amended, "[S]ection 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379 (*Mani*).)

Because Johnson's judgment is not yet final, the parties agree that the amendment to Penal Code section 654 applies retroactively under the principles of *In re Estrada* (1965) 63 Cal.2d 740, 748. We concur. (See *Mani*, *supra*, 74 Cal.App.5th at p. 379 [finding that Assem. Bill No. 518's ameliorative amendment applies retroactively under *Estrada*].)

Johnson contends the matter must be remanded for resentencing so that the trial court can decide whether to impose the lesser sentence on count 2 in lieu of the greater sentence on count 1. The Attorney General

---

[21] The trial court additionally imposed a 180-day term for count 3 but gave Johnson credit for time served.

disagrees, suggesting that remand is not required because the record shows the trial court would not have exercised its discretion to stay Johnson's longer count 1 sentence for premeditated attempted murder in favor of executing the shorter count 2 sentence for assault with a deadly weapon. In the Attorney General's view, the record is clear on this issue because the trial court denied Johnson's *Romero* motion and declined to strike any sentencing enhancements.

Johnson contends the record is not sufficiently clear to preclude remand. She points out that when the trial court denied her *Romero* motion, "a trial court's decision to strike a strike in the interests of justice under [Penal Code] section 1382 was considered an *extraordinary* exercise of discretion . . . ." (See *People v. Carmony* (2004) 33 Cal.4th 367, 378 ["Thus, the three strike law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so."].) Moreover, the trial court selected the lower term when first sentencing Johnson and remarked, "I'm going to give her the least possible." Johnson argues that, given these circumstances, it is not clear what the trial court might do with its new discretion upon resentencing.

Remand for resentencing is required "unless the record shows that the trial court *clearly indicated* when it originally sentenced the defendant that it would not in any event have [exercised its discretion in a manner favorable to the defendant]." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425, italics added.) On this record, we agree with Johnson that her case should be remanded for resentencing. Although the trial court denied her *Romero* motion, declined to strike the sentencing enhancements, and imposed the upper term on the (stayed) count 2, the trial court also expressed a desire to

give Johnson "the least possible" sentence. Although the record may suggest it is unlikely the trial court will choose the lesser sentence, it does not clearly show that the court will not. Accordingly, we remand for resentencing. We express no opinion as to how the trial court should exercise its discretion.

Upon resentencing, Johnson contends—and the Attorney General concedes—that the trial court must reconsider its decision whether to strike the enhancements in the interests of justice under Penal Code section 1385 as amended by Senate Bill No. 81. (Stats. 2021, ch. 721, § 1, eff. Jan. 1, 2022.) Senate Bill No. 81 amended Penal Code section 1385 by adding a new subdivision (c), which provides in part: "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." Amended Penal Code section 1385, subdivision (c)(7), further provides, "This subdivision shall apply to sentencings occurring after the effective date of the act that added this subdivision." "Because any resentencing in this case will take place after Senate Bill No. 81 became effective on January 1, 2022, we agree with [the parties] that the court must apply the new law in any such proceeding." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

## DISPOSITION

The case is remanded to allow the trial court to decide whether to exercise its new discretion under Penal Code section 654 as amended by Assembly Bill No. 518. Upon resentencing, the trial court shall consider whether to strike the enhancements under Penal Code section 1385 as

40

amended by Senate Bill No. 81.  In all other respects, the judgment is affirmed.

DATO, J.

WE CONCUR:

IRION, Acting P. J.

DO, J.